# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| NATHAN J. HOOLEY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:14-cv-00229-SLC** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Nathan J. Hooley appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1]  (DE 1).  For the following reasons, the Commissioner's

decision will be REVERSED, and the case will be REMANDED to the Commissioner for

further proceedings in accordance with this Opinion and Order.

## I.  PROCEDURAL HISTORY

Hooley applied for DIB and SSI on March 30, 2011, alleging disability as of February 8,

2008.  (DE 13 Administrative Record ("AR") 236-46).  The Commissioner denied Hooley's

application initially and upon reconsideration.  (AR 89-92).  After a timely request, a hearing

was held on July 27, 2012, before Administrative Law Judge Steven J. Neary ("the ALJ"), at

which Hooley, who was represented by counsel; his mother; and a vocational expert testified.

(AR 35-62).  On August 29, 2012, the ALJ rendered an unfavorable decision to Hooley,

---

[1] All parties have consented to the Magistrate Judge.  (DE 16); *see* 28 U.S.C. § 636(c).

concluding that he was not disabled because despite the limitations caused by his impairments, he could perform a significant number of unskilled jobs in the economy. (AR 96-105).

Hooley requested review of the ALJ's decision by the Appeals Council (AR 198), which was granted (AR 112-13). On September 13, 2013, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ. (AR 112-13).

On March 19, 2014, the ALJ issued a second unfavorable decision, concluding again that he was not disabled because despite the limitations caused by his impairments, he could perform a significant number of unskilled jobs in the economy, including kitchen helper, cook's helper, and hand packager. (AR 16-28). This time the Appeals Council denied Hooley's request for review (AR 7-10), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Hooley filed a complaint with this Court on July 31, 2014, seeking relief from the Commissioner's final decision. (DE 1). Hooley argues that the ALJ: (1) failed to fairly consider the opinions of Dr. Sylvia Rutten, his treating psychiatrist; Charlene Roth, his treating family therapist; and Paul Lauer, his vocational rehabilitation counselor, and improperly relied on the opinion of Dr. Shipley, the state agency psychologist; (2) improperly discounted the credibility of his symptom testimony; (3) failed to adequately analyze his mother's testimony and written statements. (DE 17 at 10-18).

## II. FACTUAL BACKGROUND[2]

At the time of the ALJ's second decision, Hooley was 37 years old (AR 236); had a high school education (AR 279); and had past work experience as a taxi driver (July 2010 to August

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 684-page administrative record necessary to the decision.

2010), in shipping (June 2010 to June 2010), and as a welder (May 1996 to February 2008) (AR 268). He alleges disability due to traumatic brain injury in 1999, seizure disorder, post traumatic stress disorder ("PTSD"), anxiety, panic attacks, depression, high blood pressure, low blood sugar, and intermittent elevated heart rate. (AR 278).

### A. Summary of the Relevant Medical Evidence

In October 1999, Hooley sustained a traumatic brain injury in a motor vehicle accident. (AR 512). He underwent a craniotomy with right temporal lobectomy with evacuation of small subdural hematoma. (AR 512). After rehabilitation, Hooley eventually returned to his same job as a group leader of a welding department, and he worked there until 2008 when the factory closed. (AR 40, 283, 286). After he lost his familiar job and routine, Hooley began experiencing mental health problems. (AR 286).

In May 2010, Hooley went to the emergency room for a dislocated jaw. (AR 429-30). At a follow up visit to his family practitioner, Hooley said he was sleeping less, crying a lot, felt nervous, and had a decreased appetite for the past six months. (AR 429). His diagnoses included depression. (AR 429).

In July 2010, Hooley was seen for a follow-up visit after he had gone to the hospital due to blacking out while helping his father. (AR 415). The doctor thought he was having a reaction to combining Effexor and an herbal supplement that he was taking for anxiety. (AR 415). Later that month, Hooley returned to the doctor after feeling weak and shaky and having memory problems; the doctor thought the symptoms were most likely due to alcohol withdrawal, and he prescribed Ativan. (AR 414).

In October 2010, Hooley was arrested for driving under the influence; he was placed on

house detention. (AR 440, 517). After stating that he was suicidal, Hooley was evaluated by Dr. Lynnea Carder, a psychiatrist at the Northeastern Center, who assigned a Global Assessment of Functioning ("GAF") score of 35 and diagnosed alcohol dependence, mood disorder secondary to frontal temporal lobe injury, and hypertension.[3] (AR 440-41). Dr. Carder prescribed medication and encouraged Hooley to participate in therapy. (AR 442). Hooley then began treatment at the Northeastern Center. (AR 606-20, 633-34).

In February 2011, Hooley was seen by Dr. Madhav Bhat, a neurologist, for episodes of palpitations, ringing in the ears, and anxiety. (AR 444-45). Dr. Bhat attributed the symptoms to panic attacks and recommended a psychiatric consultation. (AR 445).

From November 2010 to April 2011, Hooley was seen by his primary care physician, Dr. Dana Martin, for depression, hypertension, hypoglycemia, and hepatitis. (AR 473-79). From November 2010 to January 2011, Hooley reported that he felt good. (AR 473-75, 491-93). In February 2011, Hooley complained of dizziness. (AR 477, 495). From the end of March 2011 to early April 2011, Dr. Martin's notes reflected concerns about hypoglycemia. (AR 478-79,

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id.* A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*
"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in assessing Hooley, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

496-97).  On April 5, 2011, Dr. Martin noted that Hooley was sleeping well.  (AR 479, 497).

Hooley attended eight sessions with Janelle Ashby, Psy.D., from February 2011 to April 2011 due to problems with depression, anxiety, and low self-esteem.  (AR 502-22).  At his first visit, Hooley reported having panic attacks and nightmares about his accident, stating that these symptoms began in July 2010.  (AR 506).  On March 2, 2011, Hooley reported that he took Ativan to help him sleep because of the nightmares.  (AR 516).  By March 23, 2011, Dr. Ashby wrote that Hooley's panic attacks had decreased, that he was not having nightmares, and that his medicine was helping.  (AR 519).  On May 5, 2011, Dr. Ashby opined that after Hooley's possible seizure disorder and hypoglycemia were controlled and he stopped using alcohol, she "would highly suspect that the [mental status examination] would reveal significant disabilities." (AR 502-04).

In June 2011, Alan Wax, Ph.D., evaluated Hooley at the request of the Social Security Administration.  (AR 523-26).  Dr. Wax documented that Hooley described having flashbacks with depersonalization up to four times a week and anxiety that caused him to clench his jaw so tightly that he had broken teeth.  (AR 526).  Dr. Wax diagnosed Hooley with PTSD and assigned a GAF score of 48.  (AR 526).

In July 2011, William Shipley, Ph.D., a state agency psychologist, reviewed Hooley's record and completed a psychiatric review technique form.  (AR 527-543).  He found Hooley's statements about his symptoms and their functional effects were fully credible.  (AR 543).  Dr. Shipley indicated diagnoses of depression, PTSD, and substance addiction disorders and concluded that Hooley was moderately limited in his activities of daily living and in maintaining concentration, persistence, or pace, and mildly limited in maintaining social functioning.  (AR

530, 532, 535, 537).  Dr. Shipley further found that Hooley was moderately limited in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods.  (AR 541-42).  In his narrative summary, Dr. Shipley opined that Hooley could understand, remember, and carry out simple tasks; relate on at least a superficial basis with coworkers and supervisors; attend to tasks for sufficient periods of time to complete tasks; and manage the stresses involved with unskilled work.  (AR 543).  Dr. Shipley's opinion was later affirmed by a second state agency psychologist.  (AR 553).

In July 2011, Dr. M. Ruiz, a state agency physician, reviewed Hooley's record and concluded that he had no exertional limitations, but should avoid even moderate exposure to hazards due to his history of seizures.  (AR 545-52).  Dr. Ruiz's opinion was later affirmed by a second state agency physician.  (AR 554).

Hooley continued to see his family physician, Dr. Martin, from July 2011 to April 2012. (AR 573-80).  In August 2011, Hooley stated that he was sleeping well and that his mood was improved.  (AR 577-79).  In September through November 2011, Hooley stated that he was feeling better.  (AR 574-76).

On December 1, 2011, Hooley told his therapist, Ron Chupp, that he felt "really good" and was having fewer disturbing dreams and flashbacks.  (AR 599).  On December 8, 2011, he reported that he again was "doing well" and that his memory was "improved markedly."  (AR 598).  On February 16, 2012, he reported few PTSD symptoms or sleep problems.  (AR 589).

In May 2012, Hooley underwent a neuropsychological examination by Lance Trexler,

Ph.D. (AR 555-57). Hooley exhibited significant difficulty with a task requiring cognitive flexibility and working memory, borderline performance on a task of attention and concentration, mild to moderate impairment of delayed recall and immediate recall, and borderline working memory. (AR 556). Dr. Trexler described Hooley as a "fearfully dependent and socially anxious man who tends to be very self-demeaning and dejected." (AR 556). He indicated that Hooley had underlying cognitive and neurobehavioral deficits from his brain injury that continued to persist, and that he was likely to have underlying tension and emotional dysphoria with anxiety, anger, and guilt. (AR 556). Dr. Trexler wrote that Hooley presented with memory impairment for both verbal and visual information and response inhibition deficits that affect his daily functioning. (AR 557). He further indicated that Hooley's sleep was disturbed and his mood appeared to have dysregulation, consistent with an organic disorder. (AR 557).

In June 2012, Paul Lauver, a vocational rehabilitation counselor, completed a certification of eligibility for rehabilitation services on June 1, 2012. (AR 567-68). He reported that Hooley's social anxiety and memory issues interfere with his interpersonal skills; he also wrote that neuropsychological testing evidenced memory and anxiety problems and that Hooley had not been functioning well enough to go to work in the last four years. (AR 568). He wrote that Hooley was "Most Severely Disabled" for purposes of qualifying for job placement support services. (AR 568).

In July 2012, Charlene Roth, a licensed therapist, penned a report stating that she was treating Hooley and that he exhibited chronic PTSD. (AR 637). She stated that he was re-experiencing his accident in the form of flashbacks, nightmares, intrusive images, thoughts, and

psychological distress.  (AR 637).  She reported that he "has panic attacks, which he is learning to control, that come frequently, rendering him unable to hold down a full time job."  (AR 637).  She stated that he had worked hard at overcoming many of the stressors caused by the accident and brain injury, but that too much stimulation and information could cause severe headaches and be overwhelming.  (AR 637).

Hooley continued to receive treatment at the Northeastern Center through November 2013.  (AR 581-684).  Psychotherapy records from October 2012 through July 2013 generally reflect that Hooley's panic attacks, anxiety, drinking, and dizziness had reduced, and that his mood had improved.  (AR 640, 645, 647-48, 656, 659, 662, 664, 668).  A plan update in December 2012 assigned a current GAF score of 58 and reported that Hooley had fewer panic attacks and a significant decrease in symptoms since his last plan update.  (AR 679).

In December 2012, Dr. Sylvia Rutten, a psychiatrist at the Northeastern Center, evaluated Hooley.  (AR 670-72).  On Axis I, she diagnosed him with PTSD, generalized anxiety disorder, mood disorder secondary to medical condition, alcohol dependence, and hypertension.  (AR 672).  On Axis IV, she indicated that he was "[n]ot able to cope with working" and had financial stressors.  (AR 672).  When identifying Hooley's "assets," she stated that he "has attempted to get work though has not been able to deal with things."  (AR 671).  In her list of presenting problems, Dr. Rutten wrote that Hooley was having panic attacks up to five times per week, which was an improvement from a year earlier when he was having panic attacks three to four times a day; that his "concentration was easily distracted"; that he "cannot finish tasks on a regular basis"; and has difficulty "[s]taying focused for a long period of time."  (AR 670 (emphasis added)).  Dr. Rutten assigned Hooley a current GAF score of 45 and a highest-past-

year GAF score of 50.  (AR 672).

In May 2013, a plan for employment completed by vocational rehabilitation reported that Hooley's primary disability was traumatic brain injury, and that his secondary disabilities were PTSD, alcohol dependence, mood disorder, and anxiety disorder.  (AR 379-85).  The plan called for Hooley to obtain a part-time job as a warehouse worker in order to ease him back into the routine of competitive employment and to avoid his becoming over-stressed.  (AR 380). Barriers to employment included that Hooley "suffers from panic attacks that can be quite severe when he is overwhelmed."  (AR 381).

By November 2013, Hooley told his therapist that he felt good about applying for work, but that he still was having panic attacks.  (AR 638).  He had a panic attack the night before he went for a walk-through at Meijer and Culver Duck, where he hoped to obtain employment. (AR 638).  The therapist's note indicated that Hooley was using his relaxation and distress tolerance skills to more effectively manage his anxiety, but that he was "still unable to handle a work environment."  (AR 638).

### B.  Hooley's Testimony

At the first hearing on July 27, 2012, Hooley testified that he lives with his parents; he is independent with his self care.  (AR 38, 44).  He lost his license in 2010 due to driving while intoxicated; he is eligible to renew his license, but he no longer drives because it makes him anxious.  (AR 43-45).  He watches television and tries to avoid stressful or uncomfortable situations, places, and people so that he does not have a panic attack.  (AR 44).  He also researches home-based businesses online, but has difficulty following through on his ambition of starting start such a business.  (AR 43).  Several times a week, Hooley goes with his parents to

the fitness center that they own; while there, Hooley watches television and occasionally answers the telephone, gives tours, explains how to use the equipment, and makes protein shakes. (AR 39-40, 49-50).

When asked why he cannot work, Hooley stated that he cannot handle stress and becomes so anxious and "worked up" when asked to complete any small tasks that he blacks out. (AR 41). Hooley stated that he becomes anxious when "doing something new" and that he becomes "overwhelmed by too much information." (AR 41-42). When attempting to work in 2010, he stated that his heart would race and his jaw "locked shut." (AR 46). He occasionally becomes dizzy or lightheaded, particularly when in a stressful or uncomfortable situations. (AR 42). He testified that medications help reduce these symptoms "[t]o an extent," but make him feel tired. (AR 42-43).

Hooley reported that he has nightmares four times a week, but otherwise sleeps well. (AR 50, 52). He complained of having panic attacks or seizures in that every now and then he cannot breathe, his "head gets spinning," and he "locks [his] jaw shut." (AR 50). He also complained of having headaches daily, which last for 30 minutes to two hours; for this problem, he takes Tylenol and tries to calm down by going to a familiar setting and doing breathing exercises. (AR 51). He stated that his headaches are triggered by uncomfortable situations, too much information, and if he looks down or turns his head from side to side, which can also make him feel dizzy or lightheaded. (AR 51-52).

Hooley testified that when he returned to his job as a group leader of a welding department after his accident, at least once a day his group would tell him to sit down because he appeared dizzy or anxious and his boss would check in on him throughout the day to make sure

he was alright. (AR 47-49). This treatment continued until he was laid off in 2008; before his accident, however, he did not need to sit down or have people check on him on the job. (AR 48).

At the second hearing on December 23, 2013, Hooley testified that he was working at his parents' fitness center about 25 hours a week, performing clerical duties such as checking guests in and answering the telephone. (AR 66, 74). He spreads his work hours among six days of the week; the most he works in any day is five hours. (AR 75). His parents are at the fitness center most of the time that he is working (AR 75), and he naps when he returns home (AR 74). He was receiving room and board, but no other compensation. (AR 66). He stated that he was trying to start his own business exporting agricultural products, but was not having any success. (AR 66-67). He stated that he felt like he could work, but that he had not yet been able to hold down a job. (AR 67).

Hooley testified that he still experienced anxiety problems when facing new tasks or when he has to multi-task. (AR 67). At a recent "walk-through" at Meijer, he became anxious in that he shook "so bad [he] could[] hardly hold anything" and then vomited in the restroom. (AR 71). He stated that every time he has a job walk-through or an interview, he gets "worked up," has an anxiety attack, and cannot complete the process. (AR 68). He was trying to find a source of income that does not "work [him] up" and is "less stressful." (AR 68). When working at his parents' fitness center, the "uncertainty of not knowing what's ahead for the day" causes him to become so anxious that he vomits there about once a week and has to lie down and take an unplanned break. (AR 73-74). He stated that he has to have things planned out ahead of time, and becomes very anxious and nauseous if there is a change in plans. (AR 73).

Hooley asserted that dizziness, which seems to be associated with his anxiety, and lack of

endurance also affect his ability to work. (AR 69). He stated that he loses his attention span and concentration after four or five hours of doing anything. (AR 69). He also complained of having nightmares, which are more frequent when he has job interviews and walk-throughs. (AR 71). He had been meeting with a vocational rehabilitation counselor each week for the past seven months; they were currently searching for part-time warehouse positions, no more than four to six hours in a day, where Hooley would not have to interact with others. (AR 71-72).

### C. Hooley's Mother's Testimony

At the July 27, 2012, hearing, Hooley's mother testified that Hooley has lived with her and her husband all his life. (AR 53). She prepares his medications for him and many times has to remind him to take them. (AR 53). Since he stopped drinking alcohol, he has been "totally safe" staying alone at home. (AR 53). She and her husband wake him up in the morning and bring him to their fitness center so that he has "structure in his life" and because he "need[s] something to do." (AR 53-54).

At the fitness center, Hooley watches television and performs "[v]ery simple things," such as signing in guests, explaining how to use the machines, and monitoring the center. (AR 54). When asked why Hooley did not work full-time, Mrs. Hooley stated that if more than one thing comes at him at once, he may have a panic attack and has to go in the back room. (AR 55). She clarified that if there is just one guest and one task, he can usually handle it, but if the telephone rings and another guest comes in, that is too much for him. (AR 55). She could not anticipate him starting a full-time job and thought he could only handle flexible, half-days, at least to begin with. (AR 55).

At the December 23, 2013, hearing, Mrs. Hooley testified that she watches over Hooley

when working at their fitness center and tries to make sure he does not become overly excited. (AR 77-78). She keeps Ativan there in case he needs it, which is typically once or twice a month. (AR 78). She gives it to him when he states that his ears are ringing or his heart is racing. (AR 78). After taking Ativan, Hooley usually lies down in the back room for an hour. (AR 79). He needs to know his schedule in the morning, and any change in the schedule really aggravates him. (AR 80).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the

ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

### B. The Commissioner's Final Decision

On March 19, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 16-28). The ALJ noted at step one of the five-step analysis that Hooley had not engaged in substantial gainful activity since his alleged onset date of February 8, 2008. (AR 18). At step two, the ALJ found that Hooley had the following severe impairments: a history of cerebral trauma (traumatic brain injury) with resulting cognitive disorder, not otherwise specified; anxiety-related disorders (including PTSD, a panic disorder, and a generalized anxiety disorder); an affective disorder/mood disorder due to general medical conditions; and a substance addiction disorder (recently in early remission). (AR 19).

At step three, the ALJ concluded that Hooley did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 19-20). Before proceeding to step four, the ALJ determined that Hooley's symptom testimony was not entirely credible:

> [T]he claimant has the [RFC] to perform a full range of work at all exertional levels, but with the following nonexertional limitations: he cannot perform work at unprotected heights or operate hazardous moving machinery; he cannot perform detailed or complex tasks, but can perform simple, repetitive tasks; and he cannot work with the general public or in close proximity or cooperation with others.

(AR 22).

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Hooley was unable to perform his past relevant work. (AR 26). The ALJ then concluded at step five that Hooley could perform a significant number of unskilled jobs within the economy,

including kitchen helper, cook's helper, and hand packager. (AR 27). Therefore, Hooley's claims for DIB and SSI were denied. (AR 28).

### C. *The ALJ Failed to Evaluate the Opinion of Dr. Rutten, Hooley's Treating Psychiatrist*

Hooley asserts that it is unclear whether the ALJ considered and rejected, or simply failed to consider, the opinion of Dr. Rutten, his treating psychiatrist at the Northeastern Center, dated December 13, 2012 (signed February 7, 2013), which included, among other things, a diagnosis on Axis IV that Hooley was "[n]ot able to cope with working." (AR 670-72). Hooley argues that the ALJ was required to assess Dr. Rutten's opinion and apply the regulatory factors under 20 C.F.R. §§ 404.1527(c) and 416.927(c) to determine the weight that it should be afforded. *See* SSR 96-5p, 1996 WL 374183, at *3 (July 2, 1996).

"Opinions from medical sources on issues reserved for the Commissioner must not be ignored." *Eggerson v. Astrue*, 581 F. Supp. 2d 961, 966 (N.D. Ill. 2008) (citing *Clifford*, 227 F.3d at 870-71; SSR 96-5p, 1996 WL 374183, at *5). "Rather, the adjudicator must look at the evidence in the case record and determine the extent to which the opinion is supported by the record before deciding what weight the opinion should be given, if any." *Id*. (citations omitted). "Regardless, the decision must explain the consideration given to the treating source's opinion." *Id*. (citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002); *Zurawski*, 245 F.3d at 887).

Here, the only mention the ALJ made of Dr. Rutten's opinion was in stating that "an outpatient psychiatric evaluation in February 2013" was included in the most recent medical exhibit submitted from the Northeastern Center. (AR 23). The ALJ then stated that the exhibit was "reviewed in detail below to show the minimal support . . . for the claimant's allegations." (AR 23). The ALJ, however, never did address Dr. Rutten's opinion.

16

The Commissioner argues that the ALJ did not err by failing to discuss Dr. Rutten's opinion, because her Axis IV diagnosis was not a medical opinion, but rather, "a statement of fact that Plaintiff was not working at the time of the evaluation." (DE 22 at 20). The Commissioner stresses that the Northeastern Center treatment team, which included Dr. Rutten, assigned Hooley various Axis IV diagnoses in their treatment plans, including "Unemployment, Pursuit of Income" (AR 621, 683), "Unemployment" (AR 677), "Unemployment, Need for Income" (AR 679, 681), "Employment" (AR 623, 635), "Job Placement" (AR 673, 675), and "Legal System" (AR 625, 628, 631, 633).

The Commissioner's argument has some appeal, as "[a]n Axis IV diagnosis describes 'psychosocial and environmental problems that may affect the diagnosis, treatment and prognosis of mental disorders.'" *Sawyer v. Astrue*, No. 10 C 8019, 2011 WL 6101954, at *18 (N.D. Ill. Dec. 6, 2011) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 29 (4th ed. 2000)). Nevertheless, statements that Hooley was "unemployed" or "needs an income" are different than a statement that Hooley was "[n]ot able to cope with working." The former statements reflect, simply, that Hooley was not working; the latter statement suggests that Hooley was *incapable* of working. By documenting this stressor under Axis IV, Dr. Rutten expressed her view that Hooley had not been able to cope with working and that his failure to do so was a potential cause of stress, which contributed to his psychological disorders. *See id.*

Furthermore, Dr. Rutten stated elsewhere in her opinion that Hooley's "assets" included that he "has attempted to get work though *has not been able to deal with things*." (AR 671 (emphasis added)). Dr. Rutten identified that Hooley's "presenting problems" included his having panic attacks up to five times per week, which was an improvement from a year earlier

when he was having panic attacks three to four times a day; that his "concentration was easily distracted"; that he "cannot finish tasks on a regular basis"; and has difficulty "[s]taying focused for a long period of time." (AR 670 (emphasis added)).

Moreover, Dr. Rutten also assigned Hooley a GAF score upon admission of 45 and a highest-past-year GAF score of 50, both reflective of serious limitations; the ALJ, however, never mentioned these GAF scores. Yet, she penned a paragraph on the fact that the Northeastern Center treatment plans reflect a GAF score of 58, which the ALJ emphasized indicates "no more than moderate limitations in social and/or occupational functioning." (AR 24). "While it is true that an ALJ is not required to determine the extent of a claimant's disability based entirely on his GAF score, nowhere in the Social Security regulations or case law does it permit an ALJ to ignore a low GAF score while considering other higher GAF scores." *Pickett v. Astrue*, No. 1:11-cv-0160-SEB-DML, 2012 WL 4470242, at *6 n.2 (S.D. Ind. Sept. 27, 2012) (citing *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)); *see Spencer*, 2015 WL 684545, at *17 ("[A]n ALJ's failure to consider conflicting GAF scores may be problematic." (citing *Walters v. Astrue*, 444 F. App'x 913, 918 (7th Cir. 2011)); *Eisaman v. Astrue*, No. 1:11-CV-00229, 2012 WL 3028040, at *8 (N.D. Ind. July 24, 2012) ("[W]hen an ALJ cites a claimant's highest GAF score and ignores lower ones, a remand may be warranted." (collecting cases)).

The Commissioner further urges that even if Dr. Rutten's Axis IV diagnosis could be interpreted as a medical opinion, the ALJ's failure to discuss it would be harmless error, because it was on an issue reserved to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *5. Although opinions on issues reserved to the Commissioner from a treating source can never be

18

entitled to controlling weight or given special significance, such opinions "must not be disregarded." *Id.* Here, the ALJ simply disregarded Dr. Rutten's statements about Hooley's ability to work, which is not in compliance with SSR 96-5p.

Therefore, the Commissioner's final decision will be remanded so that the ALJ can properly consider the opinion of Dr. Rutten, Hooley's treating psychiatrist, including her discussion of Hooley's panic attacks and concentration problems, her statements that he had been unable to cope with working, and her assigned GAF scores.

### D. The ALJ Should Revisit Dr. Shipley's Opinion and the RFC Upon Remand

Hooley also argues that the ALJ improperly gave "significant weight" to Dr. Shipley, the state agency psychologist, who reviewed Hooley's record and found that he could manage his stress well enough to perform unskilled work. (AR 26). Hooley contends that Dr. Shipley's opinion is not substantial evidence upon which the ALJ should rely, because Dr. Shipley never directly addressed Hooley's panic attacks.

There are some aspects of Dr. Shipley's opinion that leaves the ALJ's reliance on it questionable. In his narrative statement, Dr. Shipley stated that Hooley's "statements about his symptoms and their functional effects are fully credible." (AR 543). But Dr. Shipley does not explain how, if Hooley's report of regular panic attacks is indeed fully credible (*see, e.g.*, AR 284, 286), that Hooley could obtain and maintain employment outside of a sheltered employment setting. (*See, e.g.*, AR 641 (noting that Hooley had been working with vocational rehabilitation for a "semi-sheltered placement")). As such, Dr. Shipley's opinion does not build a logical bridge between Hooley's complaint of panic attacks and the RFC determination. *See Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (finding that the state agency psychologist's opinion

"cannot provide the needed logical bridge" where the psychologist "did not actually specify how [the claimant's] migraines relate to the residual functional capacity she found").

Even if Hooley experienced just occasional panic attacks (*see* AR 26), rather than frequent,[5] he indicates that he must lie down in a quiet place for an hour after an attack. (AR 74, 79). The vocational expert explained that the typical break schedule for an employee is 30 to 60 minutes for lunch and two additional breaks of five to 10 minutes each. (AR 84). The vocational expert further testified that while some employers offer "a little bit more flexibility" and allow an employee to take their breaks on his or her own schedule, others do not, "so it would depend on the type of work and also the employer." (AR 84-85). The ALJ, however, did not incorporate any type of flexible schedule or pace into Hooley's RFC or the hypothetical posed to the vocational expert. (*See* AR 82-85); *see, e.g.*, *Edmondson v. Colvin*, No. 1:13cv313, 2014 WL 5465453, at *8 (N.D. Ind. Oct. 28, 2014) (finding that the claimant's moderate limitation in the ability to perform at a consistent pace without an unreasonable number and length of rest periods was accounted for by the ALJ's restriction to an environment free of fast-paced production requirements); *Evans v. Astrue*, No. 3:10-CV-0432-JD, 2012 WL 951489, at *23 (N.D. Ind. Mar. 20, 2012) (finding claimant's moderate limitations in pace were accounted for by an RFC for a "flexible work pace with no fast paced or production requirements").

Therefore, upon remand, the ALJ should revisit Dr. Shipley's opinion and the assigned

---

[5] Hooley also challenges the ALJ's consideration of the opinion of Ms. Roth, one of his treating therapists. Ms. Roth reported that Hooley, due to his chronic PTSD symptoms with delayed onset, "has panic attacks, which is he is learning to control, that come frequently, rendering him unable to hold down a full time job." (AR 637).
At the outset of her consideration of the medical evidence, the ALJ asserted that there are no medical exhibits offering "significant support for the claimant's more extreme allegations of very frequent panic attacks, nightmares, vomiting, and loss of concentration . . . ." (AR 23). Ms. Roth's opinion, however, supports Hooley's claim of frequent panic attacks, which undercuts the ALJ's sweeping statement.

RFC, particularly with respect to Dr. Shipley's finding that Hooley's statements about his symptoms and their functional effects are fully credible, but that he can still handle the stresses of unskilled work (AR 534), and Hooley's moderate difficulties in maintaining pace (AR 21, 537).[6]

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Hooley and against the Commissioner.

SO ORDERED.

Enter for this 29th day of September, 2015.

s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[6] Because a remand is warranted for the consideration of Dr. Rutten's and Dr. Shipley's opinions, the Court need not reach Hooley's other arguments.